Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RUSSELL M. and B.M., <br><br>              Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE INSURANCE COMPANY and UNITED BEHAVIORAL HEALTH, <br><br>              Defendants. | COMPLAINT |

Plaintiffs Russell M. and B.M., through their undersigned counsel, complain and allege against Defendants United Healthcare Insurance Company, and United Behavioral Health (collectively "United") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Russell and B.M. are natural persons residing in Palm Beach County, Florida. Russell is B.M.'s father.

2. United Healthcare Insurance Company is headquartered in Hennepin County, Minnesota and was the insurer and claims administrator, as well as the fiduciary under ERISA for

1

the insurance plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case. United Behavioral Health administers mental health claims for United Healthcare Insurance Company.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Russell was a participant in the Plan and B.M. was a beneficiary of the Plan at all relevant times. Russell and B.M. continue to be participants and beneficiaries of the Plan.

4. Plan participants and beneficiaries were told that United was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.

5. At all relevant times, United acted as the agent for both the Plan and the Plan Administrator for processing claims, communicating with Plan participants and beneficiaries about the status of their claims, and providing relevant documents, records, and other information as ERISA's claims procedure regulations define those terms.

6. B.M. received medical care and treatment at Wingate Wilderness Therapy ("Wingate") from September 13, 2022, to December 21, 2022, and Discovery Ranch ("Discovery") from December 20, 2022, to December 14, 2023.[1]

7. During the timeframe at issue in this case, these were treatment facilities located in Kane County Utah and Utah County Utah respectively, which provided sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

---

[1] Although B.M. started at Discovery on December 20, 2022, B.M.'s official discharge from Wingate was not until December 21, 2022. This is reflected in the appeals and other documentation related to this case.

8.  United denied claims for payment of B.M.'s medical expenses in connection with his[2] treatment at Wingate and Discovery.

9.  This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah and has a significant business presence there, including a large claims processing facility in Salt Lake County, and the treatment at issue took place in Utah.

11. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely both Russell's and B.M.'s privacy will be preserved.

12. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

//

//

---

[2] B.M. has at times used other names and pronouns, this is also reflected in the medical record and other documentation at issue in this case.

//

## **BACKGROUND FACTS**

### **Wingate**

13. B.M. was admitted to Wingate on September 13, 2022, due to issues which included sexual assault, suicidal ideation, self-harm, medication refusal, attachment issues, and threats towards others.

14. In a series of Explanation of Benefits statements United denied payment for B.M.'s treatment under code 8L: "YOUR PLAN DOES NOT COVER THIS THERAPY SERVICE OR ASSOCIATED EXPENSE."

15. On October 24, 2023, Russell submitted a level one appeal of the denial of payment for B.M.'s treatment. Russell wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

16. He asked that the reviewer be knowledgeable about generally accepted standards and clinical best practices for outdoor behavioral health programs in the state of Utah, as well as be trained in the details of MHPAEA to address his concerns regarding a violation of the statute.

17. Russell asserted that coverage for B.M.'s treatment was available under the terms of the Plan. He quoted the Covered Health Care Service(s) provision which stated:

> Covered Health Care Service(s) - health care services, including supplies or Pharmaceutical Products, which we determine to be all of the following:
>
> • Provided for the purpose of preventing, evaluating, diagnosing or

treating a Sickness, Injury, Mental Illness, substance-related and
addictive disorders, condition, disease or its symptoms.
• Medically Necessary.
• Described as a Covered Health Care Service in this Certificate under
Section 1: Covered Health Care Services and in the Schedule of
Benefits.
• Not excluded in this Certificate under Section 2: Exclusions and
Limitations.

18. Russell contended that the services at Wingate should have been covered under this

provision. He included a large set of documentation attesting to the effective and proven

nature of outdoor behavioral health services, including peer reviewed literature, a letter

from the National Uniform Billing Committee establishing a revenue code for these

services, along with multiple attestation letters from independent review organizations

and clinical professionals about the effective nature of outdoor behavioral healthcare.

19. Russell further argued that B.M.'s treatment, and Wingate itself, satisfied the

requirements in the CALOCUS-CASII criteria employed by United. He also argued that

Wingate was licensed and accredited and satisfied the definition of an Alternate Facility

as defined in the Plan.

20. This definition stated:

Alternate Facility - a health care facility that is not a Hospital. It provides one
or more of the following services on an outpatient basis, as permitted by law:

• Surgical services.
• Emergency Health Care Services.
• Rehabilitative, laboratory, diagnostic or therapeutic services.

It may also provide Mental Health Care Services or Substance-Related and
Addictive Disorders Services on an outpatient or inpatient basis.

21. Russell acknowledged that the Plan excluded "Adventure-based therapy, wilderness

therapy, outdoor therapy, or similar programs" under an exclusion for alternative

treatments, but argued that the active therapeutic treatment at Wingate rendered by

licensed clinical professionals was more akin to an Alternate Facility than these plan exclusions.

22. Notably, the above excluded terms are not defined. However, United's wilderness policy that it referenced in its denial letters lends credence to Russell's assertion that the wilderness exclusion refers to camping and adventure programs, as the wilderness criteria specifically identifies billing codes T2036 and T2037 as excluded. However, Wingate and other outdoor behavioral health programs bill under a 1006 revenue code.

23. Russell expressed concern that the denial of payment for B.M.'s treatment was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services in the same classification. Russell identified skilled nursing facilities, subacute rehabilitation services, inpatient habilitative services, and inpatient hospice services as some of the medical or surgical analogues to the treatment B.M. received.

24. Russell wrote that United appeared to be violating MHPAEA by categorically excluding coverage for outdoor behavioral health programs based on their facility type or provider specialty. He asked United to provide evidence of it denying analogous medical or surgical facilities in the same manner, especially those like Wingate with a valid billing code from the National Uniform Billing Committee.

25. He asked United to conduct a parity compliance analysis to ensure that the Plan was being administered in accordance with MHPAEA and asked for physical copies of the results of this analysis.

26. In addition Russell asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan

description, any insurance policies in place for the benefits he was seeking, any

administrative service agreements that existed, any clinical guidelines or medical

necessity criteria utilized in the determination (along with their medical or surgical

equivalents, whether or not these were used), together with any reports or opinions

regarding the claim from any physician or other professional, along with their names,

qualifications, and denial rates (collectively the "Plan Documents").

27. In a letter dated November 9, 2023, United again denied payment for B.M.'s treatment.

The letter stated in pertinent part:

> On 11/03/2023 United Behavioral Health (UBH) received a request from your provider for an appeal review of a non-coverage determination issued on 05/08/2023 for services provided by Wingate Wilderness Therapyu. [sic]

> As outlined in the non-coverage determination letter sent to you dated 05/08/2023, you have up to [Insert Request (Timely Filing)] [sic] days from the date you received the letter to request appeal/grievance review. We regret to inform you that UBH is unable to process the request for an appeal review, as the request was not received within the [Insert Request (Timely Filing)] day period as outlined in the enclosed Member Appeal/Grievance Rights and Instructions.

28. Additionally, in a letter dated November 28, 2023, United upheld the denial of payment

for B.M.'s treatment based on a wilderness exclusion. The letter stated that the denial had

been upheld as:

> Based on the Optum Behavioral Clinical Policy for Wilderness Therapy is [sic] considered unproven and not medically necessary for the treatment of emotional addiction, and/or psychological problems. As such, treatment in a Wilderness Therapy program is not a covered benefit. Evidence based treatment known to help your conditions was available.

> The Guideline/Policy/Criteria used for the decision is: the Optum Behavioral Clinical Policy: Wilderness Therapy which is applicable to mental health residential level of care.[3]

---

[3] Notably, although United stated that other treatment was available, and that the treatment B.M. received at Wingate was equivalent to residential care, it would go on to deny B.M.'s residential care at Discovery.

29. The letter informed the Plaintiffs that they had a right to request a second level appeal of the decision.

30. On January 16, 2024, Russell submitted a level two appeal of the denial of payment for B.M.'s treatment at Wingate. Russell argued that his ERISA rights had not been respected and United had made no attempt to meaningfully address the arguments he had raised, including his assertion that the denial of payment was a violation of MHPAEA.

31. He wrote that United had withheld the documents he requested, hindering his ability to assess United's level of noncompliance with MHPAEA. He reminded United that it had a fiduciary duty to act in his best interest and encouraged it to rectify the mistakes it had made in the appeal process going forward.

32. Russell continued to allege that coverage was available under the terms of the Plan and that Wingate met the definitions of an alternate facility and was a covered health care service as defined in his summary plan description.

33. Russell wrote that the wilderness therapy criteria used by United had been applied in error, as these criteria stated that they were intended to be utilized for services billed under codes T2036 and T2037, but the services at Wingate were billed under code 1006.

34. He continued to allege that Wingate's services were not experimental, investigational, or unproven, nor did they qualify as such under the applicable plan language. Russell included a letter from Dr. Michael Gass, an expert in the field, which criticized United's wilderness policy. Russell also included numerous other documents extolling the virtues and attesting to the clinical nature of outdoor behavioral health services.

35. Russell asked United to divulge who had developed its wilderness policy and what their qualifications were, and if United was aware of the extensive research and clinical support demonstrating the effectiveness of outdoor behavioral health programs. He also

noted that United's guidelines used the terms "wilderness camps" which he argued

"grossly mischaracterize" the treatment offered there and made the services seem like

summer camps which were not intended to offer any therapeutic value.

36. Russell further claimed that the treatment B.M. received was medically necessary and

included copies of B.M.'s medical records as well as letters of medical necessity with the

appeal. In a letter dated December 21, 2023, Jill Rickel, MS. CEP, stated:

> On June 15th, 2022, we were contacted by [B.M.'s mother] regarding her
> 15-year-old daughter, [B.M.]. Ms. [M.] was referred by a family
> member, as well as Stephanie Burstein, a therapist in Boca Raton, Florida. Ms.
> [M.] reported that [B.M.] had recently brought alcohol to camp as a
> counselor in training, had reported a history of sexual assault, recently
> stopped taking medications, had a history of self-harm and suicidal ideation,
> had attachment difficulties related to adoption, and had unhealthy
> relationships with people she had met online. [B.M.] was adopted at 10.5
> months old by Ms. [M.] and Mr. [M.]. For several years, [B.M.] and her family
> sought out-patient therapy, psychiatry, parent therapy, and an IOP style program,
> yet [B.M.] was increasingly engaging in dangerous behaviors, having significant
> difficulty with peer relationships, refusing outpatient therapy, and being deceitful.
> Of greatest concern was parents discovering on September 11th, 2022, that [B.M.]
> had lied to strangers online saying that she had watched her parents get murdered,
> was getting stabbed with needles in a facility and was being physically abused.
> She also was threatening to harm herself and was researching online how to make
> a bomb.
>
> On September 11th, 2022 [B.M.]'s parents, [the M. family], attended a virtual
> first meeting. Jennifer Sarran, M.S. CCC- SLP was also in attendance and she and
> Amber Quintero, MSW have been involved in all aspects of this case. Our
> assessment of [B.M.] records, calls with Stephanie Burstein, LMFT, parent
> therapist and Dr. Tzvi Furer, psychiatrist, and continued conversations with Mr.
> [M.] and Ms. [M.], all led us to believe that she was in need of stabilization and
> comprehensive assessment. In sum, [B.M.] was in danger of harming herself or
> getting involved in legal trouble for researching bombs or creating false
> allegations of abuse and murder. [B.M.] has a very long history of self-harm,
> suicidal ideation, social difficulties, attachment difficulties, and therapy refusal,
> and was in no way preparing for adult life after high school.
>
> After considerable research of programs recommended, Mr. [M.] and Ms. [M.]
> enrolled [B.M.] at Wingate Wilderness Therapy on September 13th, 2022.
> Wingate is an experiential, outdoor behavioral health program and was
> recommended because of its emphasis on stabilization, assessment, and beginning
> of treatment, expertise in adolescents, and chosen therapist Erin Grover, LCSW,
> MSW, TRS, CTRS, SEP. Erin specializes in working with traumatized

adolescents who often have difficulty with family and social relationships, oppositional behaviors, and attachment wounds. There were no local programs that met [B.M.]'s clinical needs.

During [B.M.]'s stay at Wingate Wilderness Therapy, she underwent comprehensive neuropsychological testing by Dr. Ingrid Boveda, Licensed Psychologist and experienced tester. This testing provided [B.M.] with the following diagnoses: Autism Spectrum Disorder, Level 1, without accompanying intellectual or language impairment; Separation Anxiety Disorder; Childhood Disorder of Social Functioning, unspecified, (disorganized attachment pattern with caregivers and peers); Persistent Depressive Disorder (Dysthymic Disorder), Unspecified Trauma and Stressor Related Disorder; and Parent Adoptive Child Conflict.

During [B.M.]'s stay at Wingate, Erin and Dr. Boveda, along with the rest of [B.M.]'s treatment team, determined that [B.M.] needed longer-term treatment as a result of her new diagnosis of Autism, and diagnoses related to depression, separation anxiety, disorganized attachment, trauma related disorder, and parent child conflict.

All treatment professionals involved, along with this consultant, determined that an aftercare program needed to: be licensed as a residential treatment center for adolescent girls, have an expertise in trauma-informed care, do strong milieu work, incorporate family therapy, have 24/7 oversight, and be small enough for [B.M.] not to be able to avoid clinical work.

Discovery Ranch South, a residential treatment center in Cedar City, Utah met these stringent requirements and [B.M.] enrolled on December 20th, 2022. There was no program locally that met [B.M.]'s clinical needs.

While at Discovery Ranch South (DRS), [B.M.] was under the care of her therapist, Amanda Mosse, LCSW, and other staff at DRS. This consultant monitored the case via consistent communication with staff. It has been determined by the DRS team that [B.M.] was an excellent candidate for the program but without completing it in its entirety, [B.M.] remained a serious risk for a return to previous dangerous behaviors and mental health issues. As experts in adolescent residential placement and after 18 years in this field having served hundreds of clients, it is the professional opinion of the consultants at AO Therapeutic Consulting Inc. that [B.M.] was in need of the highest level of clinical care in a residential treatment center. Payton met program requirements to successfully graduate from DRS on December 14th, 2023, with a plan to transition home with outpatient therapy and psychiatry, and a small school environment.

37. Ingrid Boveda, Ph.D wrote in part in a letter dated January 4, 2023:

In my capacity as a clinical psychologist, I have developed expertise in neurodivergent adolescents, particularly adolescent girls, as well as adoption,

attachment, and how these inform treatment needs. Adolescents like [B.M.], who are on the autism spectrum, require expertise and understanding of their unique neurotype in order to make progress in therapy. Oftentimes, they do not receive this help, which leads to failure. In some cases, failure means continued risk-taking, self-harm, and potential suicide. In [B.M.]'s case specifically, not only is she on the autism spectrum, but she also struggled with significant attachment issues, separation anxiety, the effects of trauma, and depression, which only complicated the situation and considerably worsened her overall prognosis.

My comprehensive evaluation of [B.M.] determined that returning home after treatment at WinGate would only lead to a regression to behaviors and struggles that she had prior to entering treatment. It was clear that she had made gains at Wingate and was more stable, but that the extent and complexity of her clinical picture meant she was not out of the woods. Trauma, issues with attachment, and mental health conditions like depression and anxiety take time and expertise to remediate under the best of circumstances. These adolescents' issues are not resolved in 12 session outpatient therapy or with medication. These were avenues that [B.M.]'s parents had already tried with no success.

The findings of my evaluation, as well as input from [B.M.]'s records, her therapist at WinGate, the educational consultants who helped find the best care for [B.M.], determined that her best chance for success, was to enter into a residential treatment program that specialized in working with adolescents who have experienced trauma, as well as experience in working with neurodivergent adolescents. It was also my professional opinion that [B.M.] needed 24/7 supervision, structure, and intensive work on social skills using an active training modality. The family also needed a program with a strong family therapy component in order to successfully support [B.M.] as she transitions home. Without the provision of these services, [B.M.] was going to be a continued risk to herself.

38. Russell expressed concern that United would attempt to supersede the opinions of the clinical professionals who had worked with B.M. on a firsthand basis and actively witnessed the deterioration of B.M.'s conditions.

39. Russell argued that United continued to violate MHPAEA by categorically excluding coverage for outdoor behavioral health programs. He again requested United perform a parity compliance analysis and again asked for a copy of the Plan Documents. He asked United to respond to each of the issues he raised in the appeal process.

40. In a letter dated January 25, 2024, United stated that Plaintiffs' internal appeal options had been exhausted. This is despite the fact, that United's previous November 28, 2023, denial letter expressly informed Plaintiffs of their right to appeal.

**Discovery**

41. B.M. was admitted to Discovery on December 20, 2022.

42. In a letter dated December 29, 2022, United denied payment for B.M.'s treatment. The letter stated that coverage was not available due to "a plan exclusion for non-emergent care at out of network out of area mental health residential level of care from 12/20/2022 forward."

43. On June 20, 2023, Russell submitted an appeal of the denial of payment for B.M.'s treatment at Discovery. B.M. reminded United of its responsibilities under ERISA and that it had a fiduciary duty to act in his best interest.

44. He wrote that the December 29, 2022, denial letter was issued in response to a preauthorization request from Discovery and pointed out that the language United cited specifically stated that it did not apply when services were preauthorized.

45. Further, Russell cited to language from his schedule of benefits which stated that "If specific Covered Health Care Services are not available from a Network provider, you may be eligible for Network Benefits when Covered Health Care Services are received from out-of-Network providers."

46. Russell wrote that no suitable in-network providers were available. He wrote that in a one-hundred-mile radius he could only find ten[4] in-network residential facilities, but due

---

[4] The appeal mistakenly initially references five facilities. Subsequent mentions as well as the appeal documentation and exhibits show ten facilities.

to their focus on conditions like eating disorders, substance use, or gender restrictions none of them offered treatment appropriate for B.M.'s needs.

47. Russell argued that B.M.'s out-of-network treatment should have been approved because no appropriate in-network alternative was an option to treat an individual with B.M.'s diagnoses and needs.

48. Russell stated that in the same one hundred mile radius United had twenty-four hospice and one hundred and twenty-four skilled nursing facilities, versus the ten in-network residential facilities to which he had access.

49. Russell wrote that United had failed to maintain an adequate network of residential providers and argued this violated MHPAEA. Russell shared articles from Milliman Inc, the U.S. Department of Labor, and the U.S. Government Accountability Office citing "ghost networks" and the frequent difficulties involved in obtaining in-network mental health care.

50. Russell again asked United to perform a MHPAEA compliance analysis and again asked for a copy of the Plan Documents.

51. In a letter dated January 5, 2023, United upheld the denial of payment for B.M.'s treatment. The letter stated that payment had been denied due to "a plan exclusion for non-emergent care at out of network out of area mental health residential level of care from 01/05/2023 forward."

52. Additionally, in a letter dated July 3, 2023, United stated in part:

> Based on my review of this request, including the supporting documentation, which was submitted with your appeal letter, the submitted claims for date(s) of service 12/20/2022 forward have not been approved for payment. A review of the claim in question reveals that residential service requested is not covered services. [sic] As described in the exclusions/limitations section of your name [sic] of the health plan Lawless Edwards & Warren, LLC certificate of coverage: health care services from an out-of-network provider for non-emergent, sub-acute inpatient,

or outpatient services at any of the following non-hospital facilities: alternate facility, freestanding facility, residential. [sic]

Treatment facility, inpatient rehabilitation facility, and skilled nursing facility received outside of the covered person's state of residence. [sic] For the purpose of this exclusion the "state of residence" is the state where the covered person is a legal resident, plus any geographically bordering adjacent state or, for a covered person who is a student, the state where they attend school during the school year.[5] This exclusion does not apply in the case of an emergency medical condition or if authorization has been obtained in advance. Page(s):35-36. Therefore, the denial of this service stands as these services are not eligible for payment.

53. On August 23, 2023, Russell submitted a level two appeal of the denial of payment for B.M.'s treatment. He argued that United had failed to respond to the arguments he had raised in the appeal process including his contention that the out-of-network denial rationale provision was not applicable when precertification was involved. He reminded United that its initial denial letter was a direct response to a precertification request.

54. He also reminded United that in cases where an appropriate in-network provider was not available, the Plan allowed for out-of-network services to be used at the in-network rate.

55. He wrote that United's failure to address the information and arguments he raised was unacceptable. He faulted United's failure to analyze whether the Plan violated MHPAEA, and its failure to provide him with the documents he requested so that he could perform his own analysis.

56. He asked how he could be confident that his plan was being administered properly when United refused to address his arguments. He asked United to specifically respond to the allegations he raised and wrote that he was willing to provide any additional information upon request. He again asked for a copy of the Plan Documents.

---

[5] In accordance with state and federal law, B.M. as a then minor child received schooling at Discovery in addition to the mental health treatment provided. According to the above definition, B.M.'s state of residence was Utah at the time.

57. In a letter dated September 12, 2023, United upheld the denial of payment for B.M.'s treatment. The letter was attributed to a new reviewer, but was word-for-word identical to the July 3, 2023, denial rationale quoted above, with the same grammatical errors.

58. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

59. The denial of benefits for B.M.'s treatment was a breach of contract and caused Russell to incur medical expenses that should have been paid by the Plan in an amount totaling over $219,000.

60. United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite Russell's requests.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

61. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

62. United and the Plan failed to provide coverage for B.M.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

63. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal

process. 29 U.S.C. §1133(2).

64. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Russell's appeals or whether it provided him with the "full and fair review" to which he is entitled. United failed to substantively respond to the issues presented in Russell's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

65. In fact, United's refusal to respond to Russell's final Wingate appeal and its repeated use of verbatim denial rationales suggest that no meaningful review occurred.

66. Despite Russell's repeated insistence that B.M. did qualify for coverage under the relevant plan terms, United failed to meaningfully respond or refute his arguments.

67. Indeed, United's final denial letter of July 3, 2023, is unintelligible for purposes of providing a response to Russell's appeal letter or in providing a meaningful denial rationale.

68. United and the agents of the Plan breached their fiduciary duties to B.M. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in B.M.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of B.M.'s claims.

69. The actions of United and the Plan in failing to provide coverage for B.M.'s medically necessary treatment are a violation of the terms of the Plan and its facility eligibility criteria.

70. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate

remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

71. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

72. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

73. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

74. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

75. The application of the facility eligibility criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than

the application of the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

76. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for B.M.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

77. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

78. United and the Plan evaluated B.M.'s mental health claims employing criteria in a manner that deviates from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

79. United denied B.M.'s outdoor behavioral health treatment in large part on the basis that it was experimental or investigational. The National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

80. Plaintiff is aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by United.

81. Additionally, for residential treatment facilities providing mental health and substance use disorders, United and the Plan fail to provide a comparable degree of network residential treatment facilities compared to the degree of network skilled nursing and inpatient rehabilitation facilities.

82. The failure by United and the Plan to provide adequate network facilities for sub-acute inpatient treatment of mental health and substance use disorders compared to the network facilities for sub-acute inpatient treatment of medical and surgical disorders resulted in a coverage disparity that violates MHPAEA.

83. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

84. United and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that United and the Plan were not in compliance with MHPAEA.

85. In fact, despite Russell's request that United and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, United and the Plan have not provided Russell with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, United and the Plan have not provided Russell with any information about the results of this analysis.

86. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants because of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan due to the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for his loss arising out of the Defendants' violation of MHPAEA.

(i) An order requiring the Defendants produce the self-compliance analysis upon request as required by MHPAEA.

87. The remedies the Plaintiffs seek under MHPAEA are not available under ERISA even if they are successful in obtaining remedies for wrongful denial of the Plan benefits.

88. For example, declaratory relief or reformation of the Plan language, are not available as remedies for a wrongful denial of plan benefits.

89. In short, remedies for the Defendants' violations of MHPAEA may only be provided by appropriate equitable relief under 29 U.S.C. § 1132(a)(3) rather than 29 U.S.C.

§(a)(1)(B).

90. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for B.M.'s medically necessary treatment at Wingate and Discovery under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 12th day of September, 2025.

By ____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Palm Beach County, Florida